UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

JOEL DEGROOT,[1]                                        Case No. DG 05-14996
                                                        Chapter 7
              Debtor.                                   Hon. Scott W. Dales

_____/

OPINION AND ORDER

PRESENT:    HONORABLE SCOTT W. DALES
            United States Bankruptcy Judge

I.  INTRODUCTION

Chapter 7 Debtor Joel DeGroot divorced his wife Joy DeGroot ("Ms. DeGroot")

on December 18, 2002.  As set forth in the Judgment of Divorce ("JOD"), Ms. DeGroot

retained the marital home and agreed to pay the Debtor $48,000.00 in several

installments.  In exchange, the Debtor agreed to provide child support by making weekly

payments.  Ms. DeGroot made the first $10,000.00 installment, but the Debtor soon fell

behind on his obligations to Ms. DeGroot and presumably his other creditors.  He filed a

voluntary petition for relief under Chapter 7 of the Bankruptcy Code just before the 2005

amendments took effect pursuant to the Bankruptcy Abuse Prevention and Consumer

Protection Act ("BAPCPA").

Ms. DeGroot's $38,000.00 obligation to the Debtor (the "Receivable") became

property of the bankruptcy estate, although the Debtor did not list the Receivable on

Schedule B.  The Chapter 7 trustee Jeff A. Moyer (the "Trustee") was aware of the

---

[1] Alias for Joel DeGroot:  aka American Truss.

estate's rights against Ms. DeGroot during the pendency of the case and took steps to administer the Receivable by recording a lien against her home, before he sought and obtained an order closing the case by filing a "no asset" or "No Distribution Report" on March 28, 2008.

In December 2010, the court granted the Trustee's motion to reopen the case, and the Trustee thereafter took steps to collect the Receivable from Ms. DeGroot, who did not have the benefit of counsel at the time.  In response to the Trustee's collection efforts, Ms. DeGroot wrote to the court outlining her dispute with the Trustee regarding the bankruptcy estate's right to collect the Receivable.  The court treated the correspondence as a motion.

## II.  JURISDICTION AND PROCEDURE

The court has jurisdiction over the bankruptcy case pursuant to 28 U.S.C. § 1334. The United States District Court has referred the Debtor's case and related proceedings, including this contested matter, to the United States Bankruptcy Court pursuant to 28 U.S.C. § 157(a) and LCivR 83.2(a) (W.D. Mich.).

Notwithstanding the Supreme Court's opinion in *Stern v. Marshall*, 131 S.Ct. 2594 (2011), during a pretrial conference conducted on August 17, 2011 the parties consented to the Bankruptcy Court's entry of a final order resolving the contested matter. They also agreed to waive the formalities associated with filing an adversary proceeding under Part VII of the Federal Rules of Bankruptcy Procedure, even though this dispute is to some extent a proceeding regarding the validity of the estate's supposed lien on Ms. DeGroot's home.  *See* Fed. R. Bankr. P. 7001(2).

The following constitutes the court's findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52 made applicable to this contested matter by Fed R. Bankr. P. 7052 & 9014(c).

### III.  ANALYSIS

A.    <u>Factual Findings</u>

Almost from the moment the family court entered the JOD, Ms. DeGroot experienced difficulties getting Mr. DeGroot to honor his child support obligations. She credibly testified that he made sporadic payments and soon incurred substantial arrearages with respect to his obligations to his two minor children and his ex-wife. For her part, Ms. DeGroot was obligated to pay Mr. DeGroot for his share of the equity in the marital home in installments as noted above, represented by the Receivable.

On October 4, 2005 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 7 which created an estate comprised of all his legal and equitable interests in property including his claims against Ms. DeGroot under the JOD. At the time of the filing, there was no dispute that Ms. DeGroot owed the Debtor (and, derivatively, his bankruptcy estate) $38,000.00 under the JOD. There is also no dispute that on the Petition Date, Mr. DeGroot owed Ms. DeGroot substantial sums in unpaid child support. The Trustee, however, disputes the precise amount of her claim.[2]

The Trustee concluded the 341 meeting in March, 2006, and over a year later, in June, 2007, he filed a Notice of Possible Dividends to Creditors (DN 16). Both before

---

[2] The Trustee contends that Ms. DeGroot's claim at the time of the filing is limited to either $13,004.00 or $13,654.00 based upon several in-court representations, but the Friend of the Court's records show that the Debtor owed Ms. DeGroot $16,606.93 on or about the Petition Date. *Compare* Exhibit 9 and Exhibit B *with* Exhibit A. Given the court's ultimate disposition, it is unnecessary to determine the precise amount of the prepetition claim.

and after the Petition Date, Ms. DeGroot pursued the Debtor in her generally fruitless attempts to collect delinquent child support obligations.

Sometime in 2006, the family court was poised to hold the Debtor in contempt (given his poor payment history) and perhaps arrest him to compel compliance with his obligations under the JOD.  At this point, the Debtor and Ms. DeGroot began negotiating a resolution of their respective claims in earnest.

Ms. DeGroot and the Debtor both retained separate counsel to assist them in resolving their divorce-related issues, and the Debtor continued to consult his bankruptcy counsel, James Sullivan, Esq.  At the hearing before this court on October 27, 2011, Mr. Sullivan acknowledged that the pendency of the Debtor's bankruptcy case complicated the negotiations between the Debtor and Ms. DeGroot.  More specifically, he recognized that the divorce-related negotiations could not come to fruition in the family court without either (a) the Trustee's abandonment of the Receivable, or (b) relief from the automatic stay.  Ms. DeGroot's counsel, James Dimitriou, II, Esq., did not testify at the October 27, 2011 hearing, but the court infers he was either ignorant of the bankruptcy complications or simply ignored them while advising Ms. DeGroot about her post-petition dealings with her ex-husband.  The negotiations nevertheless continued.

Accordingly, Mr. Sullivan wrote a letter to the Trustee on or about January 18, 2006 requesting that the estate abandon the Receivable so the Debtor could negotiate with his ex-wife.  On March 15, 2006, still digging out from the avalanche of cases that preceded BAPCPA's October 17, 2005 effective date, the Trustee "belatedly" responded to Mr. Sullivan's earlier correspondence, acknowledging the Receivable and requesting additional documentation about that asset, among others.  *See* Exhibit 13 (Letter dated

March 15, 2006 from Jeff A. Moyer to James H. Sullivan, Esq.). The next week, on March 22, 2006, the Trustee filed his "Form 1 (Individual Property Record and Report)" indicating that the estate had an interest in a "NON-EXEMPT ACCOUNTS RECEIVABLE FROM DIVORCE JDG." *See* Exhibit C.

On or about April 17, 2006, still waiting for the documents he requested in his March 15, 2006 letter, the Trustee sent a follow-up letter, which Mr. Sullivan received and responded to on or about April 20, 2006. *See* Exhibit 14 (Letter erroneously dated March 15, 2006 from Jeff A. Moyer, Esq. to James H. Sullivan, Esq.) and Exhibit D (Letter dated April 20, 2006 from James H. Sullivan, Esq. to Jeff A. Moyer, Esq.). Ten days later, Mr. Sullivan again wrote to the Trustee seeking his position on the proposed abandonment of the Receivable and informing the Trustee that the ex-spouses would be heading back to family court the following week, presumably to discuss "a settlement that Mr. DeGroot wants to enter into with his ex-wife on back support arrearages." *See* Exhibit E (Letter from James H. Sullivan, Esq. to Jeff A. Moyer, Esq., dated April 30, 2006).

Sometime between April 30, 2006 and May 15, 2006, perhaps fortuitously during unrelated creditor meetings, Mr. Sullivan and the Trustee discussed the DeGroot case. Thereafter, Mr. Sullivan again attempted to reach the Trustee by telephone, but without success. Again, he put pen to paper, this time advising the Trustee of some urgency because Ms. DeGroot "brought a Show Cause against Mr. DeGroot that can be settled once we have a position from you" on the abandonment request. *See* Exhibit F (Letter from James H. Sullivan, Esq. to Jeff A. Moyer, Esq., dated May 15, 2006). Mr. Sullivan

explained during the hearing on October 27, 2011 that his client was endeavoring to avoid the threat of incarceration in the family court relating to his child support arrears.

It appears that the Trustee did not respond to this May 15, 2006 correspondence until nine months later, in a letter from the Trustee admitting that the case "unfortunately has slipped between the cracks." *See* Exhibit G (Letter dated February 5, 2007 from Jeff A. Moyer, Esq. to James H. Sullivan, Esq.). Testimony from the Trustee established that during this period, all bankruptcy professionals were extremely busy and over-worked, endeavoring to manage the flood of cases that BAPCPA precipitated. He and his office were not immune. More specifically, he testified that his case load increased monumentally during the relevant period as many debtors filed bankruptcy petitions in the weeks leading up to October 17, 2005, hoping to avoid uncertainty or adversity under the 2005 amendments. *See* Exhibit 15.

In the meantime, however, Ms. DeGroot and the Debtor entered into, and the family court approved, a stipulation (the "Stipulation") on June 2, 2006. *See* Exhibit B (the Stipulation, "so ordered" on June 2, 2006). Through this Stipulation, the ex-spouses agreed that, upon the Debtor's payment of $11,500.00, both parties would walk away from their respective claims: Ms. DeGroot would waive her claim to past and future child support; the Debtor would waive the $38,000.00 claim representing the remaining share of the equity in the marital home. The family court also purported to discharge the lien that, at the time, ran in favor of the bankruptcy estate. At no time did either Ms. DeGroot or the Debtor file a motion for relief from the automatic stay with respect to the Receivable or their Stipulation. Instead, evidently relying on Mr. Dimitriou's advice that everything would be all right and ignoring Mr. Sullivan's contrary conclusion, the

DeGroots returned to state court and obtained an order approving their Stipulation.  Her counsel apparently failed to perceive the effect of the Debtor's bankruptcy filing on the Debtor's authority to compromise the Receivable and the family court's jurisdiction to entertain the Stipulation.

In reliance on the family court's approval of the Stipulation and her counsel's wrong-headed advice that everything was in order, Ms. DeGroot resumed her life, knowing that she could not count on the Debtor for support, but also believing that the Stipulation relieved her of her obligation to pay for the Debtor's share of the equity in the former marital residence.  She conducted herself as if she no longer had to pay $38,000.00 under the JOD, fixing up her home, paying for the activities of two children, incurring debts for orthodontia and other expenses, heedless of the fact that the Trustee retained the right to collect the Receivable from her.

Indeed, on February 5, 2007 -- the same day the Trustee wrote to Mr. Sullivan expressing his assumption that the family court did not exercise jurisdiction over the Receivable -- the Trustee signed and acknowledged the Notice of Assignment of Divorce Lien, which he recorded three days later with the Ottawa County Register of Deeds.  *See* Exhibit G and Exhibit H.  Significantly, however, although the Trustee obviously knew Ms. DeGroot's address (he included it within Exhibit H), the record contains no documentary evidence that he ever notified Ms. DeGroot that he had recorded a lien against her property.[3]  It appears that the Trustee never initiated contact with Ms. DeGroot to pursue collection of the Receivable, instead relying on the lien he had recorded to protect the estate's interest.

---

[3] During a status conference in this matter on August 17, 2011, the Trustee advised the court that he sent a copy of the lien to Ms. DeGroot.  *See* Transcript of Hearing held August 17, 2011 (hereinafter "Status Conf. Tr.") at 5:23-6:3.

Four months after recording the lien in Ottawa County, the Trustee filed the Notice of Possible Dividends. The next docket entry occurs nine months later, on March 28, 2008, when he made an electronic entry constituting the Trustee's Report of No Distribution (the "NDR"). The NDR -- an entirely electronic document -- provides as follows:

> Trustee of this estate reports and certifies that the trustee has performed the duties required of a trustee under 11 U.S.C. 704 and has concluded that there are no assets to administer for the benefit of creditors of this estate. I have received no funds or property of the estate, and paid no monies on account of the estate. Wherefore, the trustee prays that this report be approved and the trustee be discharged from office. Filed by Trustee Jeff A. Moyer.

The Trustee made these representations after filing the lien against Ms. DeGroot's house the previous year, but without taking any other steps to administer the $38,000.00 Receivable. In response to the NDR, the court closed the case and entered a Final Decree. *See* Text Order of Final Decree entered May 13, 2008 (DN 18). The court's Final Decree recites:

> The Estate of the Debtor(s) has been fully administered. The Chapter 7 Trustee is discharged as trustee of the estate and the bond is cancelled. The Chapter 7 case is closed. This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.

At no point during this entire proceeding has the Trustee suggested that he filed the NDR in error. Instead, at the status conference before the court on August 17, 2011, the Trustee explained his reasons for filing the NDR as follows:

> Because of the triggering events [*i.e.*, payment due dates under the JOD] occurring multiple years in the future, this is one of those situations that doesn't fit in the box nicely or cleanly. And the U.S. Trustee's office is not fond of letting trustees hold cases open for six or seven or eight years. So we took the only action we could at the time, and then closed the case because there were no other scheduled

> nonexempt assets, which is what the trustee's NDR filed with the
> court that causes the court to close it . . . says.

*See* Status Conf. Tr. at 11:11-20.

From the court's review of the documentary and testimonial evidence, it appears that the Trustee responded to Mr. Sullivan's several letters, but at no time consented to abandon the Receivable.  Mr. Sullivan, who did not represent either Ms. DeGroot or the Debtor with respect to their family court matters, credibly testified that he advised Ms. DeGroot's counsel, Mr. Dimitriou, that bankruptcy court approval would be required before the parties could return to family court to obtain approval of their Stipulation.  The Trustee, either through neglect or by design,[4] took no steps to collect the Receivable before closing the case, except for recording the lien in Ottawa County.

In late 2010, approximately two and a half years after the Trustee filed the NDR, Ms. DeGroot -- now experiencing her own financial difficulties -- decided to refinance her home loan to secure a more favorable interest rate and consolidate some debt, including for the orthodontia.  Shortly after applying for the loan, however, her lender advised her that the refinancing could not be accomplished without addressing the Trustee's lien against her residence.  Ms. DeGroot, either ignorant of or not recalling the lien, became quite concerned.  She contacted the Trustee, who informed her that she owed the estate $38,000.00, of which $10,000 had been overdue since December 18, 2009.  He refused to recognize the effect of the Stipulation, which he regarded as void, given the parties' failure to seek stay relief back in 2006.

---

[4] The Trustee did not offer live testimony, but instead offered a portion of his trial brief regarding his post-BAPCPA workload.  *See* Exhibit 15.

On December 30, 2010, the Trustee filed a motion to reopen the case, vaguely informing the court that "the Trustee has reason to believe there is non-exempt property of the bankruptcy estate which remains unadministered." *See* Motion to Reopen Case to Administer Assets and Waive Filing Fee (DN 19). The court reopened the case by Order dated January 3, 2011 (DN 20).

After some negotiations between the Trustee, Ms. DeGroot and the title company who was handling the refinancing, the Trustee reluctantly agreed to subordinate his lien to the mortgage of the refinancing lender, upon Ms. DeGroot's payment of $5,000.00 toward the receivable. *See* Exhibit K. The Trustee told Ms. DeGroot, however, that he would return to collect the $33,000.00 balance of the Receivable when Ms. DeGroot's youngest child reached the age of majority in 2013. Unhappily facing this prospect, Ms. DeGroot sent two letters to the court, prompting it to conduct the status conference and, later, the evidentiary hearing.

B.    Legal Conclusions

Ms. DeGroot seeks to defeat or invalidate the Receivable on several theories. First, she contends that the Debtor waived the right to collect the Receivable by entering into the Stipulation, and that the Trustee should be estopped from enforcing the Receivable because he was aware of the ex-spouses' proposed settlement and took no action to prevent them from returning to family court in 2006. Second, she contends that she holds a lien against property of the estate, including the Receivable, under M.C.L. §552.625a for unpaid child support, prepetition and post-petition. Third, she contends that the Trustee abandoned the Receivable, or should be estopped from contending

otherwise, under 11 U.S.C. § 554(c) or (d), given the representations he made in the NDR and his inaction thereafter.

1. Stipulation-Related Estoppel and the Automatic Stay

Ms. DeGroot attempts to escape the consequences of having settled with her ex-husband rather than the Trustee, by blaming the Trustee for not responding to Mr. Sullivan's letters in early 2006, and standing on the sidelines as they returned to family court. Indeed, it appears in the Trustee's own words that this case "slipped between the cracks," and his letter suggests that he did not actively pursue the Receivable or take steps to prevent the ex-spouses from returning to court. *See* Exhibit G. The court is unwilling, however, to blame the Trustee for the DeGroots' stay violations.

First, the Debtor had no colorable authority to release the Receivable by signing the Stipulation because, under 11 U.S.C. § 541(a), that claim became part of the property available to pay his creditors. As prescribed in 11 U.S.C. § 323, the Trustee is the only representative of the bankruptcy estate and therefore the only person authorized to make any decision about waiving the Receivable. After the Debtor filed his bankruptcy petition, the Debtor had no authority to compromise, discount or waive the Receivable because, by then, the Bankruptcy Code earmarked it for his creditors, not for his use in shirking his non-dischargeable child support obligations. Ms. DeGroot knew or should have known this, given the involvement of her counsel who in fact was warned about the bankruptcy-related impediments to the Settlement.

Second, the Trustee was entitled to rely, as he evidently did, upon the automatic stay. The automatic stay is designed in large measure to protect a bankruptcy estate's representative from precisely the argument that Ms. DeGroot now advances regarding the

Trustee's inaction in the early days of the case. The stay quite clearly precludes interested parties from compelling bankruptcy trustees to return to state court to avoid forfeiture, absent modification of the stay. Similarly, Congress vested exclusive jurisdiction over property of the estate, including the Receivable, in the federal bankruptcy courts largely for the same reason. *See* 28 U.S.C. § 1334(e); *In re White*, 851 F.2d 170, 172-73 (6th Cir. 1988). Because Ms. DeGroot and the Debtor did not obtain stay relief from the bankruptcy court, the family court's order approving their post petition agreement is voidable under *Easley v. Pettibone Michigan Corp.*, 990 F.2d 905 (6th Cir. 1993). Moreover, the court is not persuaded that it should refrain from voiding the Stipulation under equitable considerations dependent upon the Trustee's actions or inactions in the early days of the case, before the DeGroots returned to the family court and entered into the Stipulation.

The court acknowledges, based upon Mr. Sullivan's testimony, that Mr. Dimitriou must shoulder some of the responsibility for ignoring the automatic stay and counseling his client to return to family court to settle her claims against the Debtor. However, Ms. DeGroot must also bear the consequences for the acts or omissions of her counsel, as between her and the Trustee, under well-settled federal law. *Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 396 (1993) ("clients must be held accountable for the acts and omissions of their attorneys" and the Court of Appeals erred in holding otherwise). Indeed, in her post-hearing brief, Ms. DeGroot argues that the Stipulation should be treated as void.

Accordingly, the Stipulation is void and the Receivable survived the supposed settlement. But, as the Trustee acknowledged at the hearing and again in his brief,

voiding the Stipulation also means that the court will not treat Ms. DeGroot as having released her claims against the estate. Those claims remain available for offset to the extent allowed under 11 U.S.C. § 553.

2.    Lien Rights Under M.C.L. § 552.625a

Ms. DeGroot claims a lien against the Receivable to secure the Debtor's child support obligations pursuant to M.C.L. § 552.625a; the Trustee disagrees. According to Ms. DeGroot, the lien secures not simply the $16,606.93 arrearage she says was due on the Petition Date, but all post-petition arrears, too, in an amount well in excess of the Receivable. She also argues that 11 U.S.C. § 552(a) does not change the result.[5]

At the hearing, the parties sparred about the scope of M.C.L. § 552.625a and the Trustee's contention that the statute excludes "money to be paid . . . under a settlement of or judgment issued in a civil action . . ." M.C.L. § 552.625a(6)(e). In the Trustee's post-hearing brief, however, he appears to have abandoned that argument, and for good reason.[6] Instead, the Trustee now contends that Ms. DeGroot offered no evidence that she perfected her lien in the "same manner in which another lien on property of the same type is perfected," as the version of the statute in effect on the Petition Date (and later) requires. *See* 2002 Public Act No. 565; *see also* M.C.L. § 552.625b(3). For several reasons, the court finds it unnecessary to address the Trustee's perfection argument.

First, with respect to Ms. DeGroot's prepetition claim (which persists because the Settlement is void), Ms. DeGroot has an indefeasible setoff right in some amount

---

[5] The court agrees with Ms. DeGroot that 11 U.S.C. § 552 does not apply to statutory liens like the one Ms. DeGroot asserts, but only liens arising from "security agreements" as defined in 11 U.S.C. § 101(50).

[6] Under the Trustee's initial reading, the statute would encumber "money to be paid . . . under a settlement of or judgment issued in a civil action," by virtue of  M.C.L. § 552.625a(1) only to disencumber the same property in subsection (6)(e). This reading gives no effect to the statute's first subsection, contrary to well-established canons of statutory construction. *Shinholster v. Anaapolis Hospital*, 685 N.W.2d 275 (Mich. 2004).

between $13,004.00 and $16,606.93, offsetting the Receivable to that extent, dollar for dollar. *See* 11 U.S.C. § 553. Her setoff right does not depend upon any lien, perfected or not, under M.C.L. § 552.625a. The Bankruptcy Code itself treats her as holding a secured claim. *See* 11 U.S.C. § 506(a)(1).

Second, to the extent of any post-petition claim that may be secured by the statutory lien, the court concludes that the lien is subordinate to the Trustee's rights pursuant to M.C.L. § 552.625a(3) ("A lien created under subsection (1) [for past due support] is subordinate to a prior perfected lien. . . .")

Although the Code would require the court to disallow her claim for unmatured child support,[7] it preserves her lien against avoidance under 11 U.S.C. § 506(d) because her claim would be disallowed only because it is a claim for an unmatured debt and is excepted from discharge under 11 U.S.C. § 523(a)(5). *See* 11 U.S.C. § 502(b)(5) and 506(d)(1). This means, in effect, that Ms. DeGroot could not share in estate assets as an unsecured creditor with respect to child support claims not yet due on the Petition Date, but she could assert a lien in property of the estate for unmatured child support payments as they become due and unpaid. In other words, her lien would continue to grow post-petition as the Debtor continued to default under the JOD. Therefore, her lien would still encumber estate property, despite the disallowance of her claim.[8] The analysis, however,

---

[7] Although unmatured claims still qualify as "claims," the court is required to disallow any unmatured claim for support. *See* 11 U.S.C. § 101(5)(A) (defining "claim" to include unmatured payment rights); *id.* § 502(b)(5) (disallowing unmatured claims that are excepted from discharge under 11 U.S.C. § 523(a)(5)).

[8] This accommodation reflects a Congressional balancing of the rights of unsecured creditors against domestic relations creditors. The Bankruptcy Code permits distribution on account of claims for support that have accrued as of the Petition Date, but not unmatured claims of the same ilk. The court must disallow the latter because, like long-term claims of landlords (11 U.S.C. § 502(b)(6)), the magnitude of such claims and the difficulty of estimating them pose an unacceptable risk that these long-term creditors might enjoy a disproportionate share of estate assets. Moreover, domestic support obligations are excepted from discharge, and the court infers that Congress intended to leave the estranged spouses to their respective state law rights, largely unhindered by bankruptcy, at least with respect to support obligations.

does not end here.    The problem for Ms. DeGroot is that M.C.L. § 552.625a(3) subordinates Ms. DeGroot's lien to the Trustee's rights as lien creditor (at least with respect to post-petition child support) because the state law upon which she relies protects intervening creditors.

More specifically, M.C.L. § 552.625a clearly provides that she does not have a lien securing unmatured child support arrears, but only support that is "due and unpaid."  In other words, on the Petition Date Ms. DeGroot had a lien created by M.C.L. § 522.625a(1) on estate property, but only to the extent child support remained unpaid at that time.  This lien for matured and unpaid child support encumbers the estate's assets, and the Trustee must honor the lien to that extent. But, on the Petition Date, the Bankruptcy Code bestowed upon the Trustee the status of a judicial lien creditor. *See* 11 U.S.C. § 544(a)(1). Thus, as the Debtor continued to renege on his child support obligations, any lien for unpaid post-petition support that may have attached to estate property under M.C.L. § 552.625a(1) is subordinate to the Trustee's hypothetical judicial lien because the state statute protects intervening lienors, such as the Trustee.  *See* M.C.L. § 552.625a(3) ("A lien created under subsection (1) is subordinate to a prior perfected lien."); *Rogan v. Litton Loan Servicing, L.P. (In re Collins)*, 2011 WL 4445651 (6th Cir. BAP Aug. 12, 2011) (*citing Palmer v Washington Mut. Bank (In Re Ritchie)*, 416 B.R. 638, 643 (6th Cir. BAP 2009)) (Trustee enjoys status as judicial lien creditor under 11 U.S.C. § 544(a)(1)).  Consequently, Ms. DeGroot's reliance on M.C.L. § 522.625a to preclude the Trustee from collecting the entire amount of the Receivable is fruitless because the statute does not elevate her rights over the Trustee's status as judicial lien creditor —the holder of a "prior perfected lien."

Ms. DeGroot also claims a lien on the $5,000.00 that she paid the Trustee in order to refinance her home loan.  Although she may have enjoyed a prior lien in the Receivable to secure her prepetition claim, and although that lien might have attached to the $5,000.00 as proceeds of the Receivable, there is no evidence that she either asserted or preserved the lien when she struck her bargain with the Trustee to facilitate the refinancing.  Allowing her to assert the lien in the $5,000.00 on the theory that it represents proceeds of the Receivable would amount to sandbagging the Trustee (and the estate he represents) in a manner inconsistent with the parties' agreement and the court's opinion in *Moyer v. Baragar (In re Jessangeo, LLC),* Adv. No. 07-80526 (Bankr. W.D. Mich. Aug. 14, 2008).  The court will not countenance that result.

### 3.    Abandonment Under 11 U.S.C. § 554

Ultimately, this case depends less upon the Stipulation or Ms. DeGroot's lien than on the fact that the Trustee persuaded the court to close the case back in March, 2008, after representing that the estate was fully administered.  Because the court closed the case in response to the Trustee's NDR, and because the Trustee cites 11 U.S.C. § 554(c) and (d) in opposition to Ms. DeGroot's request for relief, it makes sense to scrutinize the applicable provisions of that statute:

> (c) Unless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title.

> (d) Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate.

11 U.S.C. §554. In two ways, Section 554 provides closure by specifying what happens to estate property at the end of a case. The statute works by providing incentives both for debtors and for trustees.

First, Section 554(c) gives debtors an incentive to comply with their disclosure obligations under Section 521(a)(1)(B)(i): assets that debtors properly schedule and that trustees do not administer will re-vest in the debtors at closing, unless the court "orders otherwise." Second, in a Chapter 7 case, Section 554(c) gives trustees an incentive to comply with their duty to promptly administer property under Section 704 because if the property is not administered at the time of the closing of the case, the court could order it abandoned to the Debtor or some other entity, despite the Debtor's failure to schedule it. The Trustee is correct that unscheduled property remains within the estate but he ignores an important qualification in the statute: "[u]nless the court orders otherwise." 11 U.S.C. § 554(d). In other words, if the "court orders otherwise," property that is not scheduled and not administered could nevertheless be deemed abandoned. Section 554(d) reinforces the incentive because property that is not administered may nevertheless be removed from the estate.

A key provision in both subsections is whether the property is administered or not, and this is within a trustee's control. Failure to administer the property puts the trustee at risk that the property may lose its status as "property of the estate." This gives a trustee ample reason to honor his or her obligation to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. §704(a)(1).

Congress wisely created two default principles, one in Section 554(c) and the other in Section 554(d), but in each case the statute permits the court to mitigate the consequences of the default rule, if the court "orders otherwise." 11 U.S.C. § 554(c) and (d).

As this contested matter shows, neither the Debtor nor the Trustee responded appropriately to these incentives, and unfortunately Ms. DeGroot has borne the brunt of these errors or omissions. For his part, the Debtor never formally listed the $38,000.00 property settlement claim on Schedule B, although his counsel did disclose it to the Trustee.[9] The Receivable was not properly scheduled, however, and the case law makes clear that a trustee's knowledge of an unscheduled asset will not, without more, re-vest it in the debtor at closing. A debtor must strictly comply with his or her disclosure obligations to earn the return. *See Bittel v. Yamato International Corp.*, 70 F.3d 1271 (6th Cir 1995); *Bonner v. Sicherman (In re Bonner)*, 330 B.R. 880 (6th Cir. BAP 2005); *Cundiff v. Cundiff (In re Cundiff),* 227 B.R. 476 (6th Cir.BAP 1998). This failure gave the Trustee the authority to negotiate with Ms. DeGroot after the court reopened the case on his motion because the Receivable technically remained within the estate under 11 U.S.C.§554(d) at the time.

Nevertheless, the Trustee also failed to appropriately administer this asset, in part, it seems, given the flood of cases that preceded the 2005 amendments. *See* Exhibit 15. He compounded this failure, however, by taking no steps to collect the Receivable other than filing a notice in the Ottawa County land records, before issuing the NDR. He did so not in error, but deliberately because, as he explained to the court during a status

---

[9] Around the time Mr. Sullivan may have perceived the need to schedule the asset, the Debtor had left the state and ceased communicating with counsel.

conference in August, he felt pressure from the United States Trustee not to keep the case open for several years as Ms. DeGroot's obligations under the JOD matured. He certainly did not collect and reduce the Receivable to money expeditiously or otherwise, and did not file an accurate final report, despite his duty to do so. *See* 11 U.S.C. § 704(a)(1) and (a)(9).

Rather than addressing the administration problems created by the long-term nature of the Receivable through negotiation with Ms. DeGroot in 2007 (when he filed the lien), or offering the Receivable for sale, the Trustee filed a statement with the court inaccurately reciting that there were "no assets to administer for the benefit of creditors of this estate" and asking the court to close the case. He evidently took these steps in reliance on a technical argument that, under 11 U.S.C. § 554(c), his knowledge of an unscheduled asset (and partial administration of the same) is irrelevant for purposes of determining whether it remained within the estate or not.

The NDR, however, "constitutes the Final Report and Final Account in an estate where the case trustee has determined that there are no assets to administer"[10] and by filing it the Trustee raised a presumption that the assets were fully administered.[11] Relying on the NDR, the court then issued the Final Decree, falsely reciting that "[t]he Estate of the Debtor(s) has been fully administered."

Consequently, the court concludes that the Trustee must be judicially estopped from now administering the balance of the Receivable. *See White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, (6th Cir. 2010) (*citing New Hampshire v. Maine*, 532

---

[10] *See* Amended Memorandum of Understanding Between the Executive Office for United States Trustees and the Administrative Office of the United States Courts Regarding Case Closing and Post Confirmation Chapter 11 Monitoring, dated April 1, 1999, at ¶II(B) (www.justice.gov/ust/eo/rules_regulations/mou99/).
[11] *See* Fed. R. Bankr. P. 5009(a).

U.S. 742, 749 (2001)).  In our circuit, courts invoke judicial estoppel to preserve their own integrity and to "prevent[] a party from abusing the judicial process through cynical gamesmanship."  *Browning v. Levy,* 283 F.3d 761, 775 (6th Cir. 2002).  Here, the Trustee took the position that the Receivable was fully administered to respond to pressure from the United States Trustee, induced the court to enter the Final Decree adopting that position, and sat quietly for several years as Ms. DeGroot went about her business evidently unaware that the Trustee would someday come calling to collect the debt she incorrectly regarded as settled.  When the time came to collect, the Trustee exploited the fact that the Debtor did not schedule the Receivable, although the Trustee was aware of it and partially administered it.  Under the unique circumstances of this case, the court regards the Trustee's closing and reopening the case in reliance on 11 U.S.C. § 554(c) and (d) as "cynical gamesmanship."

Although an adverse party's reliance on the adversary's prior position is not necessary to establish judicial estoppel,[12] the court infers that Ms. DeGroot would have made different spending decisions in the two and half years following entry of the Final Decree, perhaps foregoing orthodontia or other substantial expenditures to put money aside for the day of reckoning.

### IV.  CONCLUSION AND ORDER

As the Trustee argued under 11 U.S.C. § 554(c) and (d), the Receivable technically remained within the estate after the court closed the case in early 2008, but  unless the court exercises its authority to order otherwise, the default abandonment rules will produce a miscarriage of justice.  On this record, the court has ample cause and clear

---

[12] A party asserting judicial estoppel need not establish reliance because the doctrine advances  the court's interest in preserving its own integrity rather than the reliance interests of others. *Edwards v. Aetna Life Insurance Co..* 690 F.2d 595 (6th Cir. 1982).

statutory authority under 11 U.S.C. § 554(d) to address the problem by ordering that, notwithstanding the Trustee's technically correct argument against deemed abandonment under 11 U.S.C.§544(c) and (d), the Receivable will be deemed abandoned and no longer property of the estate pursuant to this court's order.

Today's decision is consistent with the policies behind 11 U.S.C.§554(c): it does not reward the Debtor for failing to schedule the Receivable (because Ms. DeGroot retains her rights against him and the Receivable for the unpaid child support, including any rights under M.C.L.§552.625a), and it reinforces the statutory command that trustees must expeditiously administer estate assets by collecting and reducing them to money. Equally important, the decision protects the case-closing procedures designed to bring closure to the numerous constituents affected by a debtor's bankruptcy. More fundamentally, it also preserves the court's integrity.

NOW, THEREFORE, IT IS HEREBY ORDERED that the Trustee may administer the $5,000.00 that Ms. DeGroot paid him, for the benefit of the Debtor's estate.

IT IS FURTHER ORDERED that the Receivable shall be deemed abandoned under 11 U.S.C. § 554(c) and no longer within the bankruptcy estate under 11 U.S.C. §554(d), notwithstanding the Debtor's failure to schedule it in accordance with 11 U.S.C.§ 521.

IT IS FURTHER ORDERED that the Trustee shall discharge the lien securing the Receivable by filing a formal discharge document in recordable form with the Ottawa County Register of Deeds, within 21 days after entry of this Order.

IT IS FURTHER ORDERED that if the Trustee fails to discharge the lien as prescribed in this Order, Ms. DeGroot may apply to the court for relief under Fed. R. Civ. P. 70.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Opinion and Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Jeff A. Moyer, Esq., James Oppenhuizen, Esq., and the Office of the United States Trustee.

[END OF ORDER]

**IT IS SO ORDERED.**

**Dated November 23, 2011**



Scott W. Dales
United States Bankruptcy Judge